COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judges Alston and Russell
Argued at Alexandria, Virginia


JOHN HVOZDOVIC

                                                            MEMORANDUM OPINION* BY
v.        Record No. 1146-17-4                      JUDGE WESLEY G. RUSSELL, JR.
                                                              FEBRUARY 27, 2018
SARAH McGUIRE


FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Bruce D. White, Judge

Brian M. Hirsch (Sharon F. Pederson; Hirsch & Ehlenberger, P.C.,
on briefs), for appellant.

Lavanya K. Carrithers (The Carrithers Law Office, on brief), for
appellee.


John Hvozdovic ("husband") appeals the trial court's final decree of divorce granting a

divorce from appellee Sarah McGuire ("wife") and providing for equitable distribution of their

property.  Husband specifically challenges the trial court's classification of certain assets, its finding

that he committed waste of marital property, and its ruling regarding certain evidence related to the

rental value of the parties' marital home.  Finding no reversible error, we affirm the judgment of the

trial court.

BACKGROUND

On appeal, we review the evidence in the favor of the prevailing party below.  Niblett v.

Niblett, 65 Va. App. 616, 622, 779 S.E.2d 839, 842 (2015).  Because wife prevailed on all of the

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

issues raised in husband's appeal, we consider the evidence material to the assignments of error in the light most favorable to wife.[1]

The parties were married on February 14, 1988. Two children were born of the marriage, both of whom have reached the age of majority. The parties separated on November 1, 2002, when the children were thirteen and ten, but they continued to live in the same residence until husband moved out in May 2003.[2] A separation agreement regarding several issues, including child custody and support, was reached on May 1, 2003. Wife maintained custody of the children, who lived with her through their minority. The agreement did not provide that the parties would pay for the post-secondary education of their adult children, but did specify that the parties would have an equal role in major decisions regarding the children, including decisions regarding education. After the separation, husband had limited visitation with the children.

Prior to the marriage, the parties purchased a four-bedroom home in Herndon as tenants in common. During the marriage, marital funds were used to maintain the property, and the mortgage on the home was satisfied in February 2004. After the separation, wife continued to live in the marital home, while husband rented a room in a house for between $525 and $575 per month, plus utilities, until he retired. In 2014, husband purchased a home in Blacksburg.

Husband's career was in satellite communications. Prior to marriage, beginning in 1982, husband was working for Titan, which became M/A-COM. M/A-COM eventually split into three companies, including Titan and SAIC. Husband remained with Titan until he was laid off in 1994. Husband was unemployed for several months, but then joined SAIC in July 1995. He continued to

---

[1] In crafting its equitable distribution award, the trial court considered all of the relevant factors listed in Code § 20-107.3. Although relevant to the equitable distribution award itself, many of those factors are not material to the discrete issues raised by husband on appeal. We limit our recitation of the facts to those issues that are material to the issues before us.

[2] Although husband moved out of the marital home in 2003, wife did not file the instant action for divorce until 2016.

work at SAIC up to and beyond the date of separation. In 2011, there was another company split and he began working for the other, new company, Leidos, and remained there until his retirement in 2014.

While employed with M/A-COM, husband used part of his salary to acquire stock in the company through its employee stock purchase program. From 1984 to February 1988, he acquired 310 shares of stock through the program. An additional 400 shares were purchased through Olde Discount Corporation, a brokerage firm. Two weeks prior to marriage, husband acquired an additional 194 shares through the company. Accordingly, husband held a total of 904 shares when he married wife. After marriage, husband continued to participate in his employer's stock purchase plan, acquiring a total of 764 additional shares in 1989 and 1990. Husband testified that, in 1991, he sold over 1,600 shares of stock to purchase 500 shares of Qualcomm stock, which ultimately became managed in husband's Ameriprise SmartTrade account (the "Ameriprise account"). No changes were made to the account until husband withdrew funds post-separation for college expenses for the parties' adult son. In February 2017, the value of the Qualcomm stock was $995,543.74.

During the marriage, husband also participated in SAIC's employee stock purchase plan while he was employed there. After the parties' separation, husband continued to purchase SAIC stock through the program until 2011, when the company split. At that point, the SAIC stock held by husband was divided into shares of SAIC stock and Leidos stock. Husband agreed that SAIC stock purchased during the marriage was split into both SAIC stock and Leidos stock as determined by the terms of the company split. After the split, husband continued for several months to purchase additional Leidos stock as an employee of Leidos.

Husband also contributed to a 401(k) through his employment with Titan. Titan's successor company, L3 Technologies, continued to administer the 401(k). In July 2014, husband withdrew

the $459,621.37 that had accumulated in the 401(k), opened a new Fidelity traditional IRA account, and deposited the money into the new account. At trial, husband agreed that the Fidelity IRA included funds that were earned during the marriage.

During the marriage, the parties set up 529 accounts for both children, held in wife's name. The older daughter used hers, but $17,186.33 remained in the account designated for the son, who obtained his bachelor's degree in 2015. In 2016, the son began a two-year master's program for student advisement. Husband acknowledged that he paid "essentially all of his [son's] tuitions and his room and board" to include direct deposits into the son's accounts for living expenses once he moved off campus. Husband made these payments from withdrawals of funds from the Ameriprise account, which first were transferred into husband's checking account before the expenses were paid. Husband admitted that he did not ask wife if he could withdraw the money for this purpose.

Prior to trial, the parties largely agreed which properties were subject to equitable distribution and their values as of the date of the proceedings. The classification of much of the parties' property also was stipulated.[3] Although wife agreed with the current value of the marital home, she moved to value it as of 2003, when husband moved out, alleging a value of $298,720 as of that time based on its tax assessment; in the alternative, she requested credit of $90,549 for costs associated with maintaining the home post-separation. She also requested 70% of the equity. In response, husband sought compensation for one half of the rental value of the home, plus interest,

---

[3] The parties agreed the following assets were wife's separate property: two vehicles; Wells Fargo accounts 2507 and 4839; a H&R block account; Vanguard account 4390 and IRA; Fidelity account 7778; her life insurance policy; and retirement funds from her thrift savings plan and federal pension. The parties further stipulated the Blacksburg real property; two vehicles; his two life insurance policies; MetLife stock; Wells Fargo accounts 7313, 5589, 1310, and 1792; a Pentagon Federal account; Ameriprise Brokerage account 2133; and Franklin Templeton IRA to be husband's separate property. The parties also agreed that wife was entitled to $79,707 of husband's Vanguard IRA and that husband should receive half of the marital share of wife's VDOT retirement accounts.

for his interest in the home as a co-tenant for the period after he moved out and she had exclusive possession of it.

Husband claimed a separate interest in certain stock and the Fidelity IRA. Wife sought an offset for the funds withdrawn from the Ameriprise account, alleging waste. Husband requested a reservation of spousal support. Both parties requested attorneys' fees.

A two-day evidentiary hearing was held in April 2017. During wife's testimony, a colloquy regarding the potential rental value of the marital home occurred. Husband's counsel asked wife, "[W]hat would you rent that house for today, if somebody wanted to rent it?" Wife's counsel objected, asserting that the question was irrelevant because wife had not rented the house. The court asked, "What's the relevance of the current rental value of the house?" Citing Gaynor v. Hird, 15 Va. App. 379, 424 S.E.2d 240 (1992), husband's counsel responded that as a co-tenant, "[husband] has the right to claim rent from her and so I'm asking her what she would consider to be fair market value rent of the property." Wife's counsel countered, "[A]ny reliance on Gaynor is irrelevant and immaterial in this case in that we're not post-divorce right now. . . . [Wife] is also not an expert and she doesn't know what goes into what you would rent a property for."

The court provisionally allowed the testimony, reserving ruling on the relevance, and husband's counsel proceeded to question wife. He first asked whether she was familiar with the value of the house. Receiving an affirmative response, counsel then inquired, "If you rented your house, you would certainly rent it for more than $500 per month; is that fair to say?"; wife responded, "yes." Counsel further inquired, "And you probably would rent it out for more than $1,000 a month, isn't that fair to say, a four-bedroom colonial in Herndon, Virginia?"; wife agreed. When husband's counsel then asked whether it "is fair to say for the last five years you would have rented that house for a $1,000 more per month at least," wife's counsel objected again, claiming facts not in evidence because "[s]he didn't say she was going to rent out the house over the past five

years. That's hypothetical and speculative at most." The court overruled the objection, and wife answered, "I don't know."

Husband's counsel continued, "You said it would rent now for at least a thousand a month, correct?" Wife assented and counsel followed up with "for at least the last year or two it would have rented for at least a thousand a month; isn't that fair to say?" Wife replied, "The house is in really bad shape. I don't think anyone would want to live in it right now in its current state, but yes." Counsel then referred to how much it cost wife to live in the marital home and queried, "isn't it fair to say that the rental value of that property was at least what you were paying in taxes and insurance and homeowners and repairs over the last thirteen years?", which counsel estimated to be slightly more than $500 a month.

Wife's counsel again objected on foundation grounds, noting that wife did not really know the answer. The court sustained the objection. Husband's counsel further argued,

> [T]here's a statute that deals with tenants in common in terms of somebody having exclusive use and owing rent. . . . I'm just trying to fulfill the requirements of [Gaynor] of saying what the rental value might have been or at least that the rental value was what she was paying at the time.

The court responded as follows:

> [I]f you have an expert witness to testify what the rental value is in Herndon or Reston through all these years, then I would be paying very close attention, but when you invite her to speculate on what the rental value is when she is not a person on this record who has ever rented anything, you're not giving me much help.

> So maybe I'm being more clear now, I should have been clearer earlier, it may be admissible, but there is virtually no probative value for me to try to guess what the rental value is on you saying to her you would have been paying more than what your homeowners association and taxes added up to. It's just of no value to me.

Husband offered no further evidence of rental value.

During his testimony, husband provided certain details concerning the Qualcomm, SAIC, and Leidos stocks and the Fidelity IRA. With respect to the Qualcomm stock, husband testified that he purchased 500 shares of the Qualcomm stock the same day he sold the M/A-COM shares. Husband relayed that, prior to the purchase, the M/A-COM stock was paying dividends; those dividends were deposited in the parties' joint checking account and were reported on joint tax returns. Husband maintained no separate checking account and testified, "as far as I'm concerned, any money I got went into the same pot," to include the stock dividends. All such funds went into their "joint account to pay groceries or rent or whatever." He agreed with wife's counsel when she asked, "Whenever money was put into your joint marital account, you deemed that to be used for marital purposes, correct?"

After the Qualcomm stock was acquired, it initially did not pay dividends; instead "it split and went up to 16,000 then it started paying dividends." Husband testified that he currently held over 17,000 shares and that anything over 17,000 was purchased with dividend reinvestment. He could not recall when he started receiving dividends. When questioned as to the value of the reinvestments, husband stated, "I can tell the number of shares, but I don't know what the dollar value is." He could not recall when the additional shares were purchased or at what rate. Wife testified that, during the marriage, husband asked for her consent to purchase $2,000 of Qualcomm stock with marital funds. She assented, and, according to wife, husband confirmed that he made the purchase. Ultimately, husband withdrew funds from the Ameriprise account, which held the Qualcomm stock, to help pay for his adult son's post-secondary education.

With respect to the SAIC and Leidos stock, after explaining how the companies split and handled the stock as corporate structures changed, husband was questioned on the value of the stocks at different times. He could not identify the value of the amount of the original SAIC stock that became part of the new SAIC stock. When asked whether he was aware "of the monetary value

of the separate portion [he] contributed to the new SAIC stock," husband replied "zero." He acknowledged that he was unable to value the Leidos stock from 2002 to 2011. Similarly, regarding the Fidelity IRA, when wife's counsel asked him whether he knew the pre-marital or date-of-separation value of the 401(k) funds used to create the IRA, husband stated that he did not.

At the close of the evidence, counsel presented arguments on how to treat the marital home and husband's alleged waste. In denying from the bench wife's motion for an alternate valuation date for the marital home, the court commented, "One of the things I think is significant in making this decision is the quality of the evidence with regards to the valuation at the time of separation . . . ." The court further emphasized

> the fact that the mortgage was almost paid off at the time of separation; the fact that the wife did have the use of the property without having to pay what otherwise would have been a far greater payment for housing. The figure of $1,000 a month has been tossed out. I suspect it would have been higher than that, but I don't guess as to that factor. I find that the most equitable way to value this property is the use of the current value. . . . I find good cause has not been shown to use any other date, and I find that the use of a date other than the hearing date would not attain the ends of justice.

The trial court also ruled from the bench that the $118,854.63 in withdrawals from the Ameriprise account constituted waste. The court explained:

> [I]t is significant that this was an adult child, and you all have been talking about marital purposes, and I would view hoping that your adult son gets a degree to be a paternal purpose as opposed to a marital purpose. There is no legal obligation, and the father took the funds without consultation with the mother, and I don't think that this is even really close, in my mind, that this is, in fact, waste, and that's the ruling I make.

The court then asked the parties to submit their remaining closing arguments via written memoranda and took the outstanding issues under advisement.

The trial court issued its ruling from the bench on June 1, 2017. The court adopted the parties' stipulations regarding undisputed property, then resolved the contested issues after addressing the evidence relating to the statutory factors under Code § 20-107.3.

After noting that marital funds were used during the marriage in acquiring the SAIC and thus Leidos stock, the court classified them as completely marital and awarded each party half of the value of both assets. The court expressly found that "marital property and separate property have been comingled into newly acquired property thereby resulting in the loss of the identity of the contributing properties" and transmuted into marital property. The court found that, because husband did not produce evidence as to the value of the SAIC stock at the time of separation or of the separate value of the stock prior to the split, husband failed to meet his burden in tracing any separate interest in the stock.

Although husband's Fidelity IRA was created after separation, the court deemed it to be marital property because it was a rollover account from a prior, marital account. The court concluded that, because husband "failed to identify and trace the value of the marital share of the new Fidelity IRA and failed to identify the value of any separate share[,]" the separate nature of the [account] was lost when he comingled the marital and separate shares of the original 401(k) into the Fidelity IRA." The court stated that it could not "ascertain the separate amount of funds that were contributed by the husband." The court valued the account as of March 31, 2017 at $556,381, and awarded half to wife.

The court classified the Ameriprise account and the Qualcomm stock contained therein as marital. The court based its classification on husband's inability to show "how many shares of the current Qualcomm stock was separate property" or "to trace those from the initial funds invested . . . [thus] the commingled property is deemed to be transmuted to marital property." The account was valued at $995,544 as of February 28, 2017, and the court ruled that each party was entitled to half.

The court reiterated, however, that husband's removal of $118,854.63 from the account to pay higher education expenses for the son constituted waste. The court concluded that such withdrawal was for a non-marital purpose. The court therefore awarded wife an additional $44,427.32 as an offset for the waste.[4]

In considering the assets, the court declined to apply a coverture fraction, finding it inappropriate under the facts of the case, which involved no pensions, profit-sharing plans, deferred compensation plans, or retirement benefits "in which [husband] could identify the value . . . on the date of the marriage or the date of separation." The court reemphasized husband's inability to trace his interest in the property.

With respect to the marital residence, the court valued the property at its agreed-upon current value of $448,500, with the equity to be divided equally. To that end, wife was directed to pay husband $224,250 for his interest in the property. Despite wife's requests, the court declined to use a different valuation date or to award her credit for post-separation payments; the court also denied husband's claim for post-separation rent.

The final decree of divorce reflecting these and other rulings was entered on June 23, 2017. This appeal followed, whereby husband presents eight assignments of error. Five of the assignments of error challenge the trial court's classification of certain assets, and two challenge the court's conclusion that husband committed waste when he used the Ameriprise account to fund the son's post-secondary education. The remaining assignment of error challenges the trial court's rulings related to lay testimony regarding the rental value of the marital home in the years after husband moved out.

---

[4] The trial court also found that wife committed waste when she withdrew $30,000 from her Great-West Compensation account for her own benefit.

ANALYSIS

I.  Classification of Property

In crafting an equitable distribution award, a trial court first must classify the property at issue.  Marion v. Marion, 11 Va. App. 659, 665, 401 S.E.2d 432, 436 (1991).  Property can be classified as separate, Code § 20-107.3(A)(1), marital, Code § 20-107.3(A)(2), or hybrid–that is, part marital and part separate, Code § 20-107.3(A)(3).  These distinctions are significant because marital property is subject to equitable distribution, Code § 20-107.3(A), but separate property is not.  Fowlkes v. Fowlkes, 42 Va. App. 1, 7, 590 S.E.2d 53, 56 (2003); Wiencko v. Takayama, 62 Va. App. 217, 232, 745 S.E.2d 168, 175 (2013) (recognizing that not only is separate property not subject to equitable distribution, "it is irrelevant to the equitable distribution analysis").

Here, husband challenges the trial court's classification of certain assets as marital property.  "Because the trial court's classification of property is a finding of fact, that classification will not be reversed on appeal unless it is plainly wrong or without evidence to support it."  Wright v. Wright, 61 Va. App. 432, 451, 737 S.E.2d 519, 528 (2013) (quoting Ranney v. Ranney, 45 Va. App. 17, 31-32, 608 S.E.2d 485, 492 (2005)).  Applying this standard, we address each of those assets in turn.

A.  Qualcomm Stock

The Qualcomm stock was acquired during the marriage.  Although property acquired during the marriage is presumptively marital property, Code § 20-107.3(A)(2), such property will be considered separate property if it is acquired by "bequest, devise, descent, survivorship or gift from a source other than the other party" to the marriage, Code § 20-107.3(A)(1)(ii), is "property acquired during the marriage in exchange for or from the proceeds of sale of separate property, provided that such property acquired during the marriage is maintained as separate property," Code § 20-107.3(A)(1)(iii), or is "that part of any property classified as separate

- 11 -

pursuant to" Code § 20-107.3(A)(3). Code § 20-107.3(A)(1)(iv). If the conditions of any of these subsections are met, the property, despite being acquired during the marriage, will be considered separate property. The party claiming that property acquired during the marriage is separate property bears the burden of proving that claim, Gilman v. Gilman, 32 Va. App. 104, 116, 526 S.E.2d 763, 769 (2000), and "if the property does not fall within the definition of separate property it must be classified as marital property," Garland v. Garland, 12 Va. App. 192, 196, 403 S.E.2d 4, 7 (1991).

The trial court classified the Qualcomm stock as marital property. In doing so, it did not reject husband's claim that at least a portion of the Qualcomm stock was purchased with proceeds from the sale of the M/A-COM stock he owned prior to the marriage, and thus, was separate property pursuant to Code § 20-107.3(A)(1)(iii).[5] Rather, the trial court correctly held that, to have any portion of the Qualcomm stock deemed his separate property, husband had the burden of establishing "how many shares of the current Qualcomm stock was separate property" by tracing the value of the initial investment separate and apart for any investment of marital funds.[6]

---

[5] Husband concedes that a portion of the M/A-COM stock was purchased during the marriage using marital funds. He contends that the shares purchased with marital funds were transmuted into his separate property when they were combined in an account with his pre-existing M/A-COM shares that were acquired prior to the marriage. See Code § 20-107.3(A)(3)(d). We need not reach that issue to resolve the appeal. Accepting husband's assertion as correct does not alter the analysis regarding the classification of the Qualcomm stock given the facts presented in this record.

[6] Husband notes that he testified that no marital funds were used to purchase Qualcomm stock. The trial court was not required to accept this testimony, but instead could accept wife's testimony that she gave husband permission to purchase $2,000 of Qualcomm stock with marital funds during the marriage and that he told her that he did so. Given husband's admitted failure to produce recordkeeping regarding the stock purchases and viewing the evidence in the light most favorable to wife, the factfinder could conclude that husband made such a purchase with marital funds once wife acquiesced in his request. Thus, there is evidence to support the trial court's finding that "marital funds were used to purchase . . . Qualcomm stock."

Husband, citing a lack of recordkeeping over the lengthy time period, was unable to establish the value of the stock at the relevant intervals that might allow the trial court to determine a separate property value as distinguished from the presumptively marital whole. Thus, although husband may have established that some unknown portion of the Qualcomm stock should be his separate property, he failed to provide the trial court with sufficient evidence to calculate how much. Given that he had the burden of proof on the tracing issue, the lack of such evidence is fatal to husband's claim regarding the Qualcomm stock. Bowers v. Bowers, 4 Va. App. 610, 617, 359 S.E.2d 546, 550 (1987) ("When the party with the burden of proof on an issue fails for lack of proof, he cannot prevail on that question.").

Accordingly, on this record, the trial court did not err in concluding that husband failed to make the necessary showing under Code § 20-107.3(A)(1)(iii) to classify the stock as his separate property or to trace any separate property component of the stock pursuant to Code § 20-107.3(A)(3)(e).[7] Therefore, we affirm the judgment of the trial court pertaining to the classification of the Qualcomm stock.

## B. SAIC Stock

During the marriage, husband participated in the SAIC stock purchase plan. He continued his participation after the parties separated, buying some unknown amount of SAIC after the separation. The trial court classified the SAIC stock as marital property. Husband,

---

[7] Code § 20-107.3(A)(3)(e) provides that

> [w]hen marital property and separate property are commingled into newly acquired property resulting in the loss of identity of the contributing properties, the commingled property shall be deemed transmuted to marital property. However, to the extent the contributed property is retraceable by a preponderance of the evidence and was not a gift, the contributed property shall retain its original classification.

emphasizing that the stock always was held in his name,[8] argues that the trial court should have classified the SAIC stock as his separate property or as hybrid property, with wife bearing the burden of tracing the marital share.

Once again, we note that there is a presumption that the SAIC stock acquired during the marriage is marital property. Code § 20-107.3(A)(2). Here, the stock initially was acquired with marital funds as part of the benefits of husband's employment. The trial court correctly concluded that the SAIC stock acquired during the marriage was marital.

The trial court did not find that the SAIC stock acquired after the marriage was marital property *per se*; rather, it found that any SAIC stock acquired post-separation was potentially separate property that had been commingled with marital property when it was held in the same account as the SAIC stock the court had classified as marital property. The trial court then found that, because there was no evidence as to the number of shares added post-separation or of what was the change in value of the account post-separation, the trial court could not accurately differentiate between the separate and marital components.

"When marital property and separate property are commingled by contributing one category of property to another, resulting in the loss of identity of the contributed property, the classification of the contributed property shall be transmuted to the category of property receiving the contribution." Code § 20-107.3(A)(3)(d). The SAIC stock holdings began as marital property, allowing the trial court to find that the husband's post-separation additions had been transmuted into marital property. Husband's post-separation contributions could retain

---

[8] The fact that the stock was held in husband's name does not determine whether the stock is his separate property for the purpose of equitable distribution. Garland, 12 Va. App. at 195, 403 S.E.2d at 6 (recognizing that "whether . . . property is separate or marital is determined by the statutory definition and is not determined by legal title").

their classification as his separate property only "to the extent [they were] retraceable by a preponderance of the evidence and [were] not a gift." Id.

Husband does not dispute that, on this record, it is impossible to divine the value of the SAIC stock that was acquired during the marriage or the value of the SAIC stock acquired post-separation. On brief, he writes that "there is no evidence from which to conclude what portions of the [s]tock[] were marital and which were separate."[9] Accordingly, we affirm the judgment of the trial court pertaining to the classification of the SAIC stock.

## C. Leidos Stock

All of the Leidos stock was acquired post-separation. "Generally, property acquired by one partner after the last separation . . . will not be marital property . . . ." Dietz v. Dietz, 17 Va. App. 203, 210, 436 S.E.2d 463, 468 (1993). Property that is acquired post-separation can "be classified as marital" only if the party making such a claim can "prov[e], without the benefit of a presumption, that it was acquired while some vestige of the marital partnership continued or was acquired with marital assets." Id. at 211-12, 436 S.E.2d at 469.

Here, it is undisputed that the initial holding in Leidos stock was acquired when the original SAIC stock was divided into SAIC shares and Leidos shares as a result of the company split. Thus, all of the initial Leidos stock was acquired as a result of the conversion of SAIC stock. As noted above, the trial court, on the record before it, appropriately found that the SAIC stock was marital property. Accordingly, the record similarly is sufficient to support the trial court's conclusion that the initial shares of Leidos stock are also marital property because they were "acquired with marital assets." Id.

---

[9] Having made this concession, husband contends it was wife's burden to trace out the marital portion of the SAIC stock. This is incorrect. See von Raab v. von Raab, 26 Va. App. 239, 248, 494 S.E.2d 156, 160 (1997) (holding that "the party claiming a separate interest in transmuted property bears the burden of proving retraceability").

As he had done with the initial holding in SAIC stock, husband augmented the initial holding in Leidos stock by purchasing with his separate property additional shares of Leidos stock. The newly acquired shares were held in the same account as the initial Leidos stock, which, as noted above, the trial court determined was marital property. As with the SAIC stock, husband could not identify how many additional shares of Leidos stock he purchased post-separation or their value. Thus, he conceded that "there is no evidence from which to conclude what portions of the [s]tock[] were marital and which were separate." Because the burden was on husband to trace his separate interest in the newly acquired shares, Code § 20-107.3(A)(3)(d), the failure of proof is fatal to husband's claim regarding the Leidos stock. Bowers, 4 Va. App. at 617, 359 S.E.2d at 550.

Based on the evidence before it, the trial court did not err regarding its classification of the Leidos stock. Accordingly, we affirm its judgment in this regard.

### D. Fidelity IRA

After the parties separated, husband opened a Fidelity IRA. It is undisputed that the Fidelity IRA was a roll-over account that was fully funded by husband's pre-existing 401(k). The 401(k) had been established when husband worked at M/A-COM, and contributions were made to it throughout his employment at M/A-COM's successor, Titan. According to husband, he contributed to the 401(k) for thirteen years, "six years prior to the parties' marriage and for seven years following the parties' marriage." Accordingly, the 401(k) (and hence the Fidelity IRA which was created from it) was funded with both marital assets and husband's separate, pre-marital assets that were commingled in the 401(k).

Citing Code § 20-107.3(A)(3)(d), husband argues that the portion of the 401(k) funded with marital assets was transmuted into his separate property because the 401(k) pre-existed the marriage, and thus, wife bore the burden of tracing the distinct marital component. This ignores

that, regarding retirement accounts funded by both marital and separate assets, we repeatedly have held that the burden to establish which part of a retirement account is separate as opposed to marital property falls on the party claiming the separate interest. See Chretien v. Chretien, 53 Va. App. 200, 205 n.1, 670 S.E.2d 45, 48 n.1 (2008); Frazer v. Frazer, 23 Va. App. 358, 370-71, 477 S.E.2d 290, 296 (1996); see also Pence v. Pence, 2016 Va. App. LEXIS 275, at *25 (Va. Ct. App. Oct. 18, 2016) (a retirement "account created or *added to* during the marriage is presumed to be marital property" (emphasis added) (internal quotation marks and citation omitted)).[10]

Once again, there is no dispute that the evidence presented was insufficient to allow the trial court to make any determination as to how much of the value of the IRA was the result of the pre-marital contributions and what portion of the value was attributable to the contribution of marital assets. Accordingly, the assignment of the burden of proof is dispositive of the classification question. Given our prior cases assigning the burden of differentiating between the marital and separate shares of a retirement account to the party whose separate property was contributed, the trial court did not err in classifying the Fidelity IRA as marital property. Accordingly, we affirm the trial court's judgment regarding the Fidelity IRA.

## II. Use of Funds to Pay for Adult Son's Education

Husband alleges that the trial court erred in concluding that he committed waste of a marital asset when he used the Ameriprise account to pay for expenses associated with the parties' adult son attending college and graduate school. For the following reasons, we affirm the trial court's determination that husband's expenditures from the Ameriprise account constituted waste.

---

[10] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." Otey v. Commonwealth, 61 Va. App. 346, 350 n.3, 735 S.E.2d 255, 257 n.3 (2012).

In this context, waste—which is also referred to as the dissipation of marital assets—is the "dissipation of marital funds in anticipation of divorce or separation for a purpose unrelated to the marriage and in derogation of the marital relationship at a time when the marriage is in jeopardy." Booth v. Booth, 7 Va. App. 22, 27, 371 S.E.2d 569, 572 (1988); cf. Code § 20-107.3(E)(10) (in crafting an equitable distribution award, a court shall consider, among other factors, "[t]he use or expenditure of marital property by either of the parties for a nonmarital separate purpose or the dissipation of such funds, when such was done in anticipation of divorce or separation or after the last separation of the parties"). "Once the aggrieved spouse shows that marital funds were either withdrawn or used after the breakdown, the burden rests with the party charged with dissipation to prove that the money was spent for a proper purpose." Clements v. Clements, 10 Va. App. 580, 586, 397 S.E.2d 257, 261 (1990).

Although husband maintains that the Ameriprise account was his separate property, the trial court found that it was marital property. The only asset in the Ameriprise account was the Qualcomm stock discussed above. We already have held that the trial court did not err in classifying the Qualcomm stock as marital property. Accordingly, husband's use of funds from the Ameriprise account was the use of marital funds.

Given that it is undisputed that the funds were expended after the parties separated, husband had the burden of proving, by a preponderance of the evidence, that his expenditure of the funds "was . . . for a proper purpose." Id. Citing prior decisions of this Court, he asserts he has met that burden because the "use of marital funds for the parties' child to obtain a college education constitutes a marital purpose."

Although we have affirmed the decisions of trial courts finding that payment of an adult child's college expenses was not waste in those cases, see id. at 587-88, 397 S.E.2d at 262; Amburn v. Amburn, 13 Va. App. 661, 666, 414 S.E.2d 847, 850 (1992), we have not held that,

- 18 -

as a matter of law, such payments are never waste. Husband acknowledges this reality in his opening brief, writing that "[t]his is not to say that there is a *per se* rule that use of marital funds for the parties' child to attend college is never waste." Rather, like most of the constituent parts of an equitable distribution award, whether a specific expenditure of marital assets for a child's college tuition constitutes waste is a fact-specific question committed to the discretion of the trial court to determine based on the facts of an individual case.

In concluding that, under the facts present here, husband's use of marital funds to pay for an adult son's college and graduate school expenses was waste, the trial court correctly noted from the bench that, absent a voluntary contractual undertaking, parents do not have a *legal* obligation to pay for the post-secondary education of their adult children. See Jones v. Jones, 19 Va. App. 265, 270, 450 S.E.2d 762, 764 (1994) ("No law requires a parent to provide the expenses of an adult child to attend college. Such is true whether the parents are married or divorced."). The trial court also noted that the parties' separation agreement did not provide that either parent was obligated to pay for college or graduate school for either child.[11] In fact, regarding education decisions, the agreement required equal input from both parents; however, husband unilaterally decided to use a marital asset to make the tuition payments.

Citing these statements from the bench, husband contends that the trial court improperly concluded "that any dollar spent on an emancipated child constitutes waste *per se*." Although the trial court did reference these facts from the bench, it never expressly stated that it was applying such a *per se* rule, and we decline to find that it did so. Groves v. Commonwealth, 50 Va. App. 57, 61-62, 646 S.E.2d 28, 30 (2007) (recognizing that a trial "judge is presumed to know the law and to apply it correctly in each case" and that "[o]nly clear evidence to the

---

[11] This distinguishes this situation from the facts in Amburn, where one of the parties was obligated by agreement to pay for the child's tuition. 13 Va. App. at 664-65, 414 S.E.2d at 849.

- 19 -

contrary in the record suffices to rebut the presumption" (internal quotation marks and citations omitted)).

Rather, we presume that the trial court considered these facts in conjunction with all of the evidence before reaching its conclusion regarding waste.[12] In addition to the facts referenced above, consideration of all of the evidence would allow a reasonable factfinder to conclude that, despite some visits, husband was largely absent from the children's lives and that wife bore the burden of raising them. The evidence also establishes that the son had issues regarding his education before adulthood, with husband noting that the son "had a somewhat difficult high school career" and only "had gotten his life on track in college." Additionally, the trial court could consider that the payments were made years after the parties' final separation, with a majority of the payments occurring more than a decade after the effective end of the marriage. These additional facts, when considered with everything else, allow a reasonable factfinder to conclude that the husband's payment of son's tuition was an attempt to improve his relationship with his son and was "for [husband's] own benefit and for a purpose unrelated to the marriage." Clements, 10 Va. App. at 586, 397 S.E.2d at 261.

In short, we cannot say that the evidence in this case was such that, as a matter of law, husband satisfied his burden to establish that his unilateral use of marital funds was "for a proper purpose." Id. Given the deference we owe the trial court as factfinder, we affirm the trial court's determination that the tuition payments in this case constituted waste.[13]

---

[12] The trial court's final order expressly states that its decision was rendered based "UPON CONSIDERATION of the evidence and arguments presented," which we read as indicating that the trial court considered all of the evidence.

[13] The term "waste" carries with it pejorative connotations. In this context, however, an expenditure can be for a laudable purpose and still represent an impermissible dissipation of marital assets, and thus, constitute waste.

III. Lay Testimony About the Rental Value of the Marital Home

Husband asserts that the trial court erred in failing to consider opinion testimony from the parties regarding the rental value of the marital home after the separation. Although husband correctly notes that Virginia Rule of Evidence 2:701 provides that "[o]pinion testimony by a lay witness is admissible if it is reasonably based upon the personal experience or observations" of the witness and that such lay opinion testimony "may relate to . . . the value of property," he misunderstands the trial court's ruling and the scope of the Rule.

Rule 2:701 provides that such lay testimony is admissible; it does not require that a factfinder be convinced by that testimony. Here, the trial court admitted the lay testimony husband offered through the testimony of wife as to the rental value of the home; it simply found that her testimony was of little to no probative value. Specifically, the trial court stated that her testimony "may be admissible, but there is virtually no probative value . . . . It's just of no value to me." Thus, the trial court's rulings regarding the lay testimony offered about the rental value of the marital home were wholly consistent with Rule 2:701, and thus, the trial court did not err regarding this issue.[14]

---

[14] As the party seeking to establish the rental value, husband bore the burden of proof on the issue.

> The phrase "burden of proof" refers to two related but distinct concepts: (1) The "burden of production," which is the obligation to come forward with evidence to make a prima facie case . . ., and (2) the "burden of persuasion," which is the obligation to introduce evidence that actually persuades the fact finder to the requisite degree of belief that a particular proposition of fact is true.

SunTrust Bank v. PS Bus. Parks, L.P., 292 Va. 644, 652, 791 S.E.2d 571, 575 (2016) (quotation marks and citation omitted). Wife's testimony regarding value may have satisfied the burden of production; however, given that the factfinder did not find it convincing, it did not satisfy husband's burden of persuasion.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.[15]

<u>Affirmed.</u>

---

[15] Both parties request an award of attorneys' fees on appeal. Under the circumstances, we decline to award either party such fees.